UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

IN RE:                                      )
ROGER DARYL FRENCH and                      )       CASE NO. 15-40758
DENA G. FRENCH                              )
                                            )
                       DEBTORS              )
                                            )
SECURITY SEED AND CHEMICAL, INC.            )
                                            )
                       PLAINTIFF            )
                                            )
VS.                                         )       ADVERSARY PROCEEDING
                                            )         NO.15-4041
                                            )
                                            )
ROGER DARYL FRENCH, and                     )
DENA G. FRENCH                              )
                                            )
                       DEFENDANTS           )

## MEMORANDUM OPINION

This matter is before the Court after the conclusion of a trial on the merits of the cause of action brought by Plaintiff, Security Seed and Chemical, Inc. ("Security Seed"), against Defendants, Roger Daryl French and Dena G. French, under 11 U.S.C. § 523 and the Defendants' Motion to Avoid Lien filed in the main bankruptcy case. In its complaint seeking a determination of nondischargeability, the Plaintiff also included two separate counts to determine the validity of liens. Both the Plaintiff and the Defendants appeared at trial and were represented by counsel. At the trial, the parties presented evidence, both written and documentary. Upon consideration of the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

## FINDINGS OF FACT

The Defendants are agriculture producers.  The Defendants grow row crops, including corn, winter wheat, and soybeans in the vicinity of Union County, Kentucky.  Mr. French has been in the farming business for his entire adult life and has immediate family members in the farming business. At various times, Mr. French has also driven tractor-trailers to haul crops and coal as a source of additional income.

In late 2012 and early 2013, the Defendants were suffering financial difficulties.  By March of 2013, the Defendants were overdrawn on their two bank accounts. Specifically, the "farm account" at United Community Bank was overdrawn on seven (7) occasions between March 13 – March 21, 2013.  The "joint checking account" with the same bank was overdrawn on five occasions between February 27 – March 12, 2013.

In February 2013, Mr. French approached Security Seed to purchase seed, fertilizer, and chemicals he would need for the upcoming crop year.  Mr. French had been a customer of Security Seed dating as far back as 2010, and he had a line of credit with that company from that date forward through the crop season 2013.  Each prior line of credit had been paid off in full from crop proceeds at the end of each crop season.

The Plaintiff advised Mr. French that he needed to obtain financing through AgQuest Financial Services, Inc. ("AgQuest") in order to purchase products on credit.  A Security Seed employee furnished Daryl French with an AgQuest loan application (the "Loan Application").  Mr. French completed the handwritten figures on the Loan Application.  Mr. French signed the Loan Application and then gave it to Mrs. French to sign.  Mrs. French testified that she signed the application in reliance that Mr. French completed it correctly.  Mrs. French did not consult any

financial records to verify the accuracy of the financial representations on the Loan Application. She also testified that she had no first-hand knowledge of the financial information contained in the Loan Application.

The Defendants requested financing from AgQuest for an operating line of credit to purchase farm inputs such as seed, pest control, and fertilizer. The Defendants were familiar with the lending process in order to obtain farm loans. In that regard, the Defendants have completed a number of farming loan applications over the years with various lenders.

On February 28, 2013, the Defendants signed and delivered to the Plaintiff the Loan Application requesting a $50,000 line of credit. Under the line of credit, the Defendants could purchase seed, chemical and fertilizer from Security Seed, which would then be paid by AgQuest in the short term until the Defendants then paid the line of credit off at the end of the crop season.

The Loan Application was forwarded to AgQuest by Security Seed via facsimile on March 21, 2013. The Loan Application consisted of basic information, including financial information. The first page of the application contains three columns and, as filled in, those columns report as follows:

| | |
|---|---|
| Gross Farm Income | $504,000.00 |
| Non-Farm Income | $150,000.00 |
| Source of Non-Farm Income | Trucking |
| Assets: | |
| Current Assets | $300,000.00 |
| Non-Current Assets | $ [Blank] |
| Long Term Assets | $ 45,000.00 |

| | |
|---|---|
| Total Assets | $345,000.00 |
| Liabilities: | |
| Current Liabilities | $  45,000.00 |
| Term Liabilities | $ [Blank] |
| Long Term Liabilities | $  25,000.00 |
| Total Liabilities | $  65,000.00[1] |
| Net Worth | $280,000.00 |

Shane Mays testified that he is a business relationship manager for AgQuest in Western Kentucky.  He personally received the Defendants' loan application when it was faxed on March 21, 2013.  In order to process a credit request for less than $200,000, AgQuest only requires the loan application, a copy of the applicant's driver's license, and a retailer reference.  The Defendants provided all of this required information.

For this particular loan program, AgQuest uses a three part underwriting criteria to evaluate the loan application.  First, the loan request cannot be greater than 20% of the applicant's net-worth.  Second, the net-worth to total assets ratio ("owner's equity") must exceed 50%.  Third, the loan application is sent to a company called On the Spot Scoring ("OTS") for an "OTS Score," and the borrowers score must exceed 200.

AgQuest evaluated the Loan Application submitted by the Defendants.  The Defendants' loan request met the first underwriting criteria, since the loan amount was for less than 20% of their

---

[1] The Court notes the obvious addition error in totaling the liabilities and the resulting error in the net worth which, due to the math error, overstated the net worth.  With adjustments for the computation error, Defendants represented total liabilities of $70,000, and therefore, a stated net-worth of $275,000.

4

stated net-worth.  Mr. Mays testified that with regard to this first guideline, under no circumstances would AgQuest ever make a loan of any kind where the applicant had a negative net-worth.  Mr. Mays explained that, in such an instance, the loan application would not even be sent for an OTS score.  Mr. Mays further testified that if a debtor's net worth was $0, then no loan would be made.

As to the second guideline, the Defendants' loan request met the required owner's equity of greater than 50%.  Mr. Mays stated that the Defendants' application met this requirement with an owners equity position of approximately 80%. ($275,000/$345,000: 79.7%).

AgQuest then sent the application to OTS, which produced the "OTS Score."  The score on this particular application was 204 or 206.  Any score above 200 resulted in a loan approval.  A score below 200 would have required that the proposed debtor provide AgQuest balance sheets and a prior history.

In evaluating the Loan Application, OTS also performed a credit check.[2]  In this case, the credit report reflected the Defendants possessed liabilities in the approximate amount of $113,000, which is $48,000 more than the amount listed by the Defendants in the loan application.

Neither AgQuest nor Security Seed requested any additional information such as tax returns, additional financial statements, or balance sheet from the Defendants in connection with the Loan Application.  Mr. Mayes testified that it was critical for his lending institution to have accurate financial information on loan applications from potential debtors.

While the Defendants listed liabilities at only $65,000 on the Loan Application, according to the Defendants' sworn interrogatories, at the time of the Loan Application, their actual liabilities

---

[2] The evidence is not clear on which entity actually ran the credit report.  Mr. Mays from AgQuest testified at one time that AgQuest ran the credit report, but at a later time testified that OTS ran the credit report.  He was sure, however, that only one credit report was run.

totaled $498,265. By using the Defendants' actual liabilities in the amount of $498,265 and the $345,000 listed in assets on the loan application, at the time the loan was made, the Defendants had a negative net-worth of (-$153,265). Accordingly, the loan application overstated the Defendants' net-worth by $428,265 (difference between -153,265 to +275,000).

Mr. French tried to explain this large discrepancy, by stating that when he completed the liabilities section, he believed the section was asking for his yearly payment amounts, rather than the total liabilities owed. Mr. French assumed the information being requested was the amount of the payments due on various liabilities during the course of the coming year, rather than the total amount of those liabilities.

Evidence was introduced that Mr. French has only a high school education. Mr. French specifically testified that he did not intend to deceive the Plaintiff when he filled out the application. He also testified that he had every intention of repaying the loan when he submitted the loan application.

However, evidence was also produced that he had run a farming operation since 2001 or 2002, and that he had financed his crop needs for several years prior to this particular loan.[3] Mr. French was not a novice to borrowing money, and while not college educated, he was somewhat sophisticated as it pertains to farming operations dependent upon financing. Additionally, evidence was also introduced that had this loan not been approved, Mr. French would not have had sufficient funds to plant crops for the 2013 crop year. Certainly, Mr. French had a motive to insure that the

---

[3] The Court presumes the Defendants accurately listed their financial information in their previous loan applications with the Plaintiff or AgQuest. Such evidence would have been probative on the issue of whether Mr. French accurately understood his obligation to list his total liabilities, rather than just his yearly debt payments. Previous loan applications with the Plaintiff or AgQuest were not, however, entered into evidence.

Loan Application was approved.

The Loan Application was approved, and on or about April 9, 2013, the Defendants executed an instrument styled Companion Direct Promissory Note and Loan Agreement (referred to as the "2013 Direct Loan"). The 2013 Direct Loan provided the Defendants a line of credit up to $50,000, with a 7.25% interest rate. The line of credit was available for the purchase of agriculture products and inputs available through the authorized retailer, Security Seed & Chemical, Inc.

Additionally, pursuant to the terms of the 2013 Direct Loan, the Plaintiff would be entitled to recover all its costs, expenses, and fees, including reasonable attorney's fees, incurred by AgQuest as the result of the enforcement of the agreement or collection of the indebtedness.

During the course of the 2013 crop year, the Defendants purchased various agriculture products and inputs under the 2013 Direct Loan. Specifically, on or about May 8, 2013, AgQuest advanced principal in the amount of $22,524.75, and on or about May 8, 2013, AgQuest advanced principal in the amount of $21,130.25. Finally, on or about May 8, 2013, AgQuest advanced principal in the amount of $5,921.61. The sum of $49,576.62 in credit was advanced under the 2013 Direct Loan for purchases made by the Defendants over the crop season from Security Seed.

Mr. French made a second loan application ("Second Loan Application") in October, 2013 for the 2014 crop year. The Court is unsure how much Mr. French actually requested because Mr. Mays altered the document by whiting out the loan amount and inserting the figure of $60,000 in the Loan Amount Requested Box.[4] The original requested loan amount was whited out and reduced to a $60,000 loan-to-net-worth figure, a figure that, at the time, Mr. Mays was sure would be

---

[4] Other numbers in the Second Loan Application may also have been altered. Mr. Mays denied altering the other numbers, but the document appears to have been altered. If altered, the Court cannot make a finding as to who or why these other numbers were altered.

approved.  This alteration was made after the Mr. French had signed the document.

With this Second Loan Application, however, the Defendants' OTS Score had fallen from 206 to 174, thus triggering an additional review.  As part of the additional review, AgQuest required a balance sheet and a copy of 2012 tax return.  Upon review of this additional information by a credit officer, this second loan application was not approved and did not close.

After the $50,000 AgQuest funds were exhausted, Mr. French needed to buy additional products and custom spraying applications from Security Seed.  Consequently, in addition to the 2013 Direct Loan, the Plaintiff also sold on "Open Account" various chemicals, fertilizer and/or seed to Mr. French between March 25, 2013- August 27, 2013.  The terms of the Open Account with the Plaintiff provides for a finance charge of 1.5 % per month (18% APR).  As of July 31, 2014, the amount of the principal and finance charges on the Open Account totaled $66,633.75.

AgQuest perfected its security interest by filing a Financing Statement with the office of the Kentucky Secretary of State on January 16, 2014.

Due to flooding, crop season 2013 was a disaster.  The tax returns show that Mr. French's farming income fell dramatically.  While he did receive crop insurance proceeds, 2013 was still a bad financial year for the Defendants.  In addition to the lower farming income, Mr. French's trucking business also fell off drastically due to cut backs, rising gas prices, and the closing of coal mines in the Union County area.

The 2013 Direct Loan matured on November 30, 2013.  The Defendants defaulted on the 2013 Direct Loan by failing to repay the total amount owed by the maturity date.  Since that time, the Defendants made no voluntary payments of either principal or interest on the 2013 Direct Loan. AgQuest assigned all of its rights arising under the $50,000 line of credit to Security Seed by virtue

of an instrument dated July 14, 2014, that is styled "Assignment of Promissory Note and Loan Agreement and Financing Statement."

Due to the default, Plaintiff filed suit against the Defendants and on October 21, 2014, the Plaintiff obtained a Default Judgment from the United States District Court for the Western District of Kentucky, Case No. 4:14-cv-00093-M in the principal amount of $141,054.26. Of this amount, $54,027.95 was attributed to the 2013 Direct Loan and $87,026.31 was attributed to the Open Account.

Subsequently, a Writ of Execution was issued to the Sheriff of Union County, Kentucky. The Execution Order issued March 3, 2015, was returned bearing the date of March 13, 2015, by the Sheriff of Union County, Kentucky, reflecting that it was served on the Defendant, Dena G. French, and Defendant Roger Daryl French. Dena French's Levying Officer's Return noted: "Located all items on asset list other than the 2005 Sea Ray. Dena advised it was in Illinois." Roger French's Levying Officer's Return notes: "Located all items other than 2005 Sea Ray. Dena advised it was in IL." There was no evidence presented that the sheriff took possession of any of the items that were described on the attachment to the Execution Order.

On September 9, 2015, the Defendants filed for Chapter 7 bankruptcy protection. The Plaintiff timely commenced this adversary proceeding on December 1, 2015, seeking to except these debts from discharge, as well as a ruling on the validity and extent of its liens. On October 27, 2015, the Defendants filed a Motion to Avoid the Plaintiff's judicial lien on real property.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (K) and venue is proper under

28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

Plaintiff seeks to except the discharge of this debt under 11 U.S.C. § 523(a)(2)(B)[5]. To prevail, Plaintiff must prove each of the elements of that section of the Bankruptcy Code by a preponderance of the evidence. In re Keeney, 227 F.3d 679, 683 (6th Cir. 2000). The Bankruptcy Code should be construed liberally in favor of the debtor. Id.

The relevant statutory provision is contained in 11 U.S.C. § 523(a)(2)(B), which provides as follows:

> "A discharge under Section 727,...of this title does not discharge an individual debtor from any debt -
>
> (2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
>
>     (B)    use of a statement in writing -
>
>         (i)    that is materially false;
>
>         (ii)    respecting the debtor's or an insider's financial condition;
>
>         (iii)    on which the creditor knew the debtor is liable for such money, property, services, or credit reasonably relied; and
>
>         (iv)    that the debtor caused to be made or published with the intent to deceive..."

Under 11 U.S.C. § 523(a)(2)(B), a debt may be declared non-dischargeable if four elements are met. First, the debtor must have obtained money or credit by use of a written statement that is

---

[5] As an alternative relief, the Plaintiff also sought to except this debt from discharge under 11 U.S.C. § 523(a)(2)(A). The Court finds no testimony or other evidence to reflect actual fraud on the part of the Defendants or false representations made to the Plaintiff, other than the Loan Application. Accordingly, the Plaintiff's contentions pursuant to 11 U.S.C. § 523(a)(2)(A) are without substance.

materially false. Second, it must be respecting the debtor's or an insider's financial condition. Third, it must have been reasonably relied upon by the creditor. Fourth, it must have been caused to be made or published with intent to deceive. Steier v. Best, 287 B.R. 671, 675 (W.D. Ky. 2002).

The Court will first start with Mrs. French. While it is true that Mrs. French signed the Loan Application, and that it did contain materially false financial information, it is equally true that Mrs. French did not cause the information to be made or published with an intent to deceive. The uncontroverted evidence was that Mr. French was responsible for filling out the Loan Application and submitting it to the Plaintiff. Absolutely no evidence was presented suggesting that Mrs. French took part in the preparation of the document or that she intended to deceive the Plaintiff with the false information. As such, all claims against Mrs. French fail.

Turning to Mr. French, the Court believes that the claims of the Plaintiff can be separated into two separate categories: (1) the debt arising from the Loan Application and the 2013 Direct Loan; and (2) the debt arising from the Open Account. The Court will first address the 2013 Direct Loan.

## I. 2013 Direct Loan

With respect to the 2013 Direct Loan, the Court has no problem finding the first three elements are met. As stated above, funds were advanced based upon the February 28, 2013 Loan Application. That application was in writing and was clearly materially false. In addition to other erroneous entries, Mr. French listed liabilities of only $65,000, when in fact his liabilities were closer to $500,000. Such a discrepancy is clearly material.

The Court also finds that the Plaintiff reasonably relied upon the information contained in the loan application. Testimony was presented that had the true financial information been

11

disclosed, this application would have been denied at the outset. Reliance on the information provided by Mr. French, was reasonable especially considering the parties' past financial arrangements. This Court finds that the Plaintiff did rely on the Loan Application, and such reliance was reasonable. Moreover, the loan process outlined by the Plaintiff, with an initial evaluation, a second third-party evaluation, and the potential need for follow-up documentation procedure, was a reasonable process for the Plaintiff to have followed.

The Defendants contest the reliance element of the statute. They first argue that the credit application was made not to Security Seed but rather to AgQuest. The Defendants appear to be disregarding the fact that the note was validly assigned to Security Seed from AgQuest. As such, the Court may test AgQuest's reliance, rather than Security Seed's reliance.

Second, Mr. French argues that the Loan Application was not relied upon to decide if a loan would be made, but rather was used solely to determine how much a loan would be approved. The Defendants argue that this reliance does not meet the requirements of § 523(a)(2)(B)(iii). This argument, however, overlooks the fact that testimony was provided that had Mr. French listed his true financial situation, with a negative net worth, no loan would have been approved.

"Generally, courts have held that 'reasonable reliance' is a question of fact to be determined in light of the totality of the circumstances." Buckeye Ret. Co., LLC v. Kakde (In re Kakde), 382 B.R. 411, 422 (Bankr. S.D. Ohio 2008) (citations omitted). The Sixth Circuit has identified five factors that may affect the reasonableness of a creditor's reliance: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have

12

alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.  Jennings v. Bodrick (In re Bodrick), 509 B.R. 843, 857 (Bankr. S.D. Ohio 2014) (quoting Oster v. Clarkston State Bank (In re Oster), 474 Fed.Appx. 422, 425 (6th Cir. 2012)).

In this case, the Plaintiff did have a close personal relationship with the Defendants.  Mr. Thomas testified that the Plaintiff had a relationship with Mr. French and his family.  Plaintiff had provided the Defendants financing for several years prior to the 2013 Direct Loan, with no problems. The debt was incurred by Defendants for business reasons. While the credit report indicating slightly higher liabilities than listed may have raised a red flag, it was not so substantial to taint the whole analysis of the Loan Application.  Finally, and most significantly, AgQuest did perform an investigation, minimal as it was, and it did not uncover the massive amount of liabilities the Defendants failed to list on the Loan Application.  In light of the totality of the circumstances in this case, the Plaintiff has demonstrated that it reasonably relied upon the Defendants' statements in the Loan Application.  Compare In re Brent, 539 B.R. 788, 806 (Bankr. S.D. Ohio 2015) (no reasonable reliance where no minimum investigation undertaken).

The Defendants take great issue with the fact that the Plaintiff never required tax returns, a balance sheet, or other financial documents when making its decision to loan money.  However, when a loan is relatively small, especially when compared to the purported net worth of the Defendants, and there were prior business dealings between the parties, leading the Plaintiff to believe the loan documents reliable; this Court cannot find that the Plaintiff unreasonably relied upon just the Loan Application.  See In re Martin, 761 F.2d 1163, 1166, 1167 (6th Cir. 1985).

13

This leaves the final element to be determined: whether Mr. French submitted materially false financial information with the intent to deceive.  Mr. French contends that he did not make or publish the financial statement with intent to deceive the Plaintiff.  To succeed on its complaint, the Plaintiff must prove that Mr. French's false written statement was either knowingly false or made so recklessly as to warrant a finding that the he acted fraudulently.  In re Batie, 995 F.2d 85 (6th Cir. 1993).  To make its determination, the Court may consider the totality of the circumstances to make an inference whether the debtor submitted a false financial statement with the intent to deceive.  In re Morrison, 555 F.3d 473 (5th Cir. 2009).  A determination of intent to deceive focuses on circumstantial evidence and is generally "inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive or cheat the creditor."  John Deere Co. v. Myers (In re Myers), 124 B.R. 735, 741 (Bankr. S.D. Ohio 1991).

Here, the Court finds that Mr. French's written financial statement was knowingly made false with intent to deceive.  The Loan Application requested information as to the total liabilities.  Rather than listing his total liabilities of close to $500,000.00, Mr. French instead listed the much smaller figure of $65,000.00.  Mr. French's explanation that he believed that the application was asking for only his yearly payments is simply not credible or plausible.

The Court supports this finding by again noting that, as to financing farming operations, Mr. French was quite adept, having financed his farming operations for several years.  Mr. French had filled out several loan applications in the past, and was quite familiar with the terminology of the application.  The Court simply cannot believe that Mr. French saw this question asking for current liabilities and legitimately thought it was asking for a payment figure as opposed to total liabilities.  There was no language in the Loan Application suggesting a request for debt payment information.

Instead, the Loan Application clearly requested income, assets, liabilities. This information, per the Loan Application, was to be used to determine "Net Worth." How would providing loan payment information assist in calculating net worth?

Additionally, Mr. French clearly needed financing to continue his farming operations, and knew that if his true liabilities were listed, it would be likely that his loan request would be denied. Mr. French knew he could not farm the 2013 season without financial assistance, and he had every incentive to fabricate the numbers to show a better financial condition than he was actually in.

Because the Plaintiff proved by a preponderance of the evidence all the elements required to except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), the debt associated with the 2013 Direct Loan is excepted from discharge. Said debt includes post judgment interest as well as the Plaintiff's costs, expenses, and fees, including reasonable attorney's fees, incurred as the result of the enforcement of the agreement or collection of the indebtedness. Cohen v. de la Cruz, 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) ( Section 523(a)(2) provides that a debt, "to the extent it was obtained by" the criteria listed in subsection (B), is nondischargeable in full. The phrase "encompasses any liability arising from money, property, etc., that is ... obtained" by the means prescribed under § 523(a)(2)(B), including, where applicable, attorney's fees.).

## II. Open Account

The Court now turns to the debt associated with the Open Account. According to the Default Judgment entered by the United States District Court, this debt totals some $87,026.31 as of October 123, 2014. This debt was incurred on an Open Account for various chemicals, fertilizer, and/or seed.

This debt is somewhat more problematic. Unlike the 2013 Direct Loan, the evidence is not

15

at all clear that this debt was obtained by the use of a false written statement, that there was any reliance, much less reasonable reliance, or that the statement, if there was one, was published with an intent to deceive.

To begin, no evidence was presented as to how or why this credit was extended.  Much of the evidence presented at trial concerned only the 2013 Direct Loan.  Mr. Cory Thomas, the representative of the Plaintiff, was asked the following question: " So now when Security Seed got past $50,000, it knew it was lending money for which it had no right to expect payment from AgQuest, didn't it?"  He responded, "I think we had an application going to the grower to extend his amount of credit there at that time."  Based upon this testimony, it appears to the Court the Open Account credit was extended upon the Second Loan Application that, in the end, was never approved.

Later in his testimony, Mr. Thomas admitted that the Open Account credit was issued without being approved by AgQuest.  He indicated that the credit was based upon a "new application," and that the credit was extended prior to the "new application" going through the AgQuest and OTS screening process.  When questioned on this, Mr. Thomas testified they "were probably relying on his first application," even though the first application (the Loan Application) only requested a line of credit of $50,000.

Plaintiff appears to be arguing that the Open Account credit was also based upon the Loan Application, but this would clearly conflict with the terms of the amount borrowed under that document.  That document called for a line of credit up to $50,000, while this Open Account clearly exceeded that figure.

Assuming *arguendo* that the Loan Application was the basis for the Open Account credit

16

extension, the Plaintiff's reliance on the Loan Application for this additional credit would be seriously questioned. Plaintiff would not have been following its own procedure for extending credit. Moreover, relying upon the Loan Application that, at best, should be considered stale, would not be reasonable. "Where a bank relies on stale financial statements, and never inquires as to whether the statements actually reflect the debtor's <u>current</u> financial situation, the bank fails to show reasonable reliance." <u>In re Benore</u>, 108 B.R. 797, 799 (Bankr. M.D. Fla. 1989) (emphasis added).

The Court believes rather that the Plaintiff extended the Open Account credit on the belief that the Second Loan Application would be eventually approved. Mr. Thomas' testimony that "we had an application going" supports this conclusion. Additionally, Mr. Thomas confirmed that the amount to be borrowed on the second application was changed to reflect an amount ($60,000) that is surprisingly close to an amount ($60,783.36) that had been lent over the original $50,000. Because that Second Loan Application was eventually denied, the Plaintiff is now trying to bootstrap the Open Account credit to the original Loan Application and 2013 Direct Loan.

Finally, even if the Plaintiff had proved that the Open Account credit was based upon the Loan Application, and that it had reasonably relied upon that document for additional financing, no evidence was presented as to the Defendants' intent with respect to this additional financing. Because the Court does not believe the Open Account debt is tied into the original Loan Application, the Court will not impute the fraudulent intent of the original Loan Application to the subsequent Open Account credit. No evidence was presented that Mr. French intended the original Loan Application to be used for subsequent credit, and there is no evidence that he intentionally gave this false statement with the intent to deceive to obtain additional credit.

Absent showing a materially false written document, any reasonable reliance, and any

17

fraudulent intent with respect to the Open Account, the Court cannot except this debt from discharge under 11 U.S.C. § 523(a)(2)(B).

### III. Count II of Plaintiff's Complaint

The Court now turns to the second count of the Plaintiff's complaint. Count II asked the Court to determine the validity and of the Plaintiff's lien on several pieces of personal property.

As found above, the Plaintiff obtained a default judgment against the Defendants on October 30, 2014. According to Rule 69(a)(1) of the Federal Rules of Civil Procedure, a "money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution--and in proceedings supplementary to and in aid of judgment or execution--must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed.R. Civ. P. 69.

Under state law, Kentucky Revised Statute § 426.383 provides as follows: "A lien shall be created on the property of the defendant by the levy of the attachment; or by service of the summons, with the object of the action indorsed thereon, on the person holding or controlling his property." Ky. Rev. Stat. Ann. § 426.383 (Baldwin 1991). Additionally, Kentucky courts have held that

> a lien on a specific piece of property acquired by attachment does not become effective merely by issuance of the writ of attachment or by placing the writ in the hands of an officer, ... nor does a lien become effective merely upon delivery of a copy of the attachment to the debtor.... There must be an actual levy on the property itself.

Thacker v. Commonwealth, 284 S.W.2d 325, 326 (Ky. Ct. App. 1955) (citations omitted); U.S. v. Dishman Independent Oil, Inc., 46 F.3d 523, 527 (6th Cir. 1995). Thus, in Kentucky, "an attachment lien becomes effective at the time of levy." In re Dishman Independent Oil Corp., 1993 WL 110032, at 2 (Bankr. E.D. Ky. 1993). Black's Law Dictionary defines levy as "To take or seize property in

18

execution of a judgment." Black's Law Dictionary (10th ed. 2014).

Upon examining the record in the case at hand, the Court cannot find that there was ever an actual levy on any property. An Execution Order was issued to the Sheriff of Union County, Kentucky. The Execution Order issued March 3, 2015, was returned bearing the date of March 13, 2015, by the Sheriff of Union County, Kentucky, reflecting that it was served on the Defendant, Dena G. French, and Defendant Roger Daryl French. Dena French's Levying Officer's Return noted that "Located all items on asset list other than the 2005 Sea Ray. Dena advised it was in Illinois." Roger French's Levying Officer's Return stated "Located all items other than 2005 Sea Ray. Dena advised it was in IL." There was no evidence presented that the sheriff actually took possession of any of the items that were described in the Execution Order. In its complaint, the Plaintiff alleged that "[property] of the Defendants that was levied upon by the Execution Order is indicated in the list attached with the Execution Return." The actual Levying Officer's Returns do not support that statement – that the property was actually levied upon. Without an actual levy, no lien became effective.[6]

The Plaintiff argues that physical possession is not required, and that when the levying officer serves the execution with "particularity and distinctness," the debtors may continue to hold property as the bailee for the levying officer. Plaintiff cites W. E. Stephens Mfg. Co. v. Miller, 429 S.W.2d 384, 386 (Ky.1968) in support of its position. The Court disagrees with the Plaintiff's reading of this case. The actual line from the case states "'[personal] property levied on should be described in the indorsement of the levy with particularity and distinctness.'" Id. at 387 (citations

---

[6] Some of the pleadings make reference to the fact that the sheriff may have taken possession of some or all of the items at a later date, but there was no evidence presented at trial to substantiate this allegation.

omitted).  This passage indicates that property levied upon should be described with particularity and distinctness.  It does not remove the requirement of an actual levy.

Plaintiff also cites In re John Galt Energy, Inc., 75 B.R. 658, 664 (Bankr. E.D.N.Y. 1987) in support of its position.  While a New York case, that court applied Kentucky law and set forth a four-step process for the creation and perfection of an execution lien under Kentucky law.  This process requires: (i) issuance of an execution; (ii) delivery of the order or writ to the proper official to execute; (iii) a valid levy against property of the judgment debtor; and (iv) making of an adequate return by the levying official.  Id.  "Perfection of the execution lien is attained when a valid levy is made against the property and the levying officer makes an adequate return of execution."  Id.  The Court does not believe this case supports the Plaintiff's position like it believes it does.  The third part of the test requires a valid levy.  As stated above, a levy requires a seizure.

The Plaintiff also argues that so long as the levying officer exercises dominion and control over property, he may leave it in the possession of another.  In the case of C. T. C. Inv. Co. v. Daniel Boone Coal Corp., 58 F.2d 305, 315 (E.D. Ky. 1931), the court held that it "is well settled that if the officer makes an actual seizure he need not retain the actual possession. He may surrender and entrust it to the defendant in the execution."

The Court is not faced with the situation where an actual seizure took place, and then the property is left in another's possession.  The C. T. C. Inv. Co.  case, cited above, also held that "it is sufficient that the officer at least bring the property within his immediate control" and "it is sufficient that the officer do something which is equivalent to a claim of dominion over the property."  Id. at 315.

This Court finds a Levying Officer's Return which simply states that he located property is

sufficient to indicate that he brought the property within his immediate control, or that he did something which is the equivalent as exercising dominion over the property.  See also South Bay Enterprises, Inc. v. Mirada Bay Petroleum, Inc., 957 S.W.2d 287, 289 (Ky. App.,1997) ("This holding is also supported by In re Baird, 55 B.R. 316 (Bankr. W.D. Ky.1985), in which it was held that a judicial lien is unperfected unless a valid levy is made against the property of the debtor, and In re Wilson, 38 B.R. 940, (Bankr. W.D. Ky. 1984), in which the Court ruled that a lien is not perfected unless the sheriff makes a proper levy.").

### IV. Count III of Plaintiff's Complaint

The Court now turns to Count III of the complaint, the request to determine the validity of the judgment lien.  In its complaint, the Plaintiff states "[following] the entry of judgment in Case No. 4:14-cv-00093-M, the Plaintiff filed a judgment lien in the office of Union County Clerk on November 6, 2014, Encumbrance Book 33, Page 46."

Judgment liens are created by KRS 426.720, which provides in pertinent part:

> (1) A final judgment for the recovery of money or costs in the courts of record in this Commonwealth, whether state or federal, shall act as a lien upon all real estate in which the judgment debtor has any ownership interest, in any county in which the following first shall be done:
>
> (a) The judgment creditor or his counsel shall file with the county clerk of any county a notice of judgment lien containing the court of record entering the judgment, the civil action number of the suit in which the judgment was entered, and the amount of the judgment, including principal, interest rate, court costs, and any attorney fees;
>
> (b) The county clerk shall enter the notice in the lis pendens records in that office, and shall so note the entry upon the original of the notice;

Ky. Rev. Stat. Ann. § 426.720(1).

Upon review of the record in this case, the Court can find no evidence that the judgment was

21

recorded with the county clerk.  Nevertheless, the Defendants' answer admitted that the Plaintiff

filed a judgment lien in the office of Union County Clerk on November 6, 2014, Encumbrance Book

33, Page 46.  In light of this admission, the Court finds that the Plaintiff has a valid and enforceable

judgment lien on the Defendants' real property located in union County, Kentucky.

### V. Defendant's Motion to Avoid Lien

Finally, this takes the Court to the Motion to Avoid Lien filed by the Defendants in the main

bankruptcy case.  In the motion, the Defendants seek to avoid the Plaintiff's judgment lien as it

pertains to specific real property.  Pursuant to § 522(f), the Defendants claim that this judicial lien

impairs their exemption in the property described in the motion.

Section 522 of the Bankruptcy Code exempts certain property from the bankruptcy estate.

11 U.S.C. § 522.  Section 522(f) addresses the avoidance of certain liens and provides, in relevant

part:

> (1) ... [T]he debtor may avoid the fixing of a lien on an interest of the
> debtor in property to the extent that such lien impairs an exemption
> to which the debtor would have been entitled under subsection (b) of
> this section, if such lien is –
> (A) a judicial lien, .......
>
> (2) (A) For the purposes of this subsection, a lien shall be considered
> to impair an exemption to the extent that the sum of --
>
> (i) the lien;
>
> (ii) all other liens on the property; and
>
> (iii) the amount of the exemption that the debtor could claim if there
> were no liens on the property;
>
> exceeds the value that the debtor's interest in the property would have
> in the absence of any liens.

First National Bank of Manchester v. Elza, 536 B.R. 415, 417 (E.D. Ky. 2015).   This section

permits a debtor to avoid certain judicial liens to the extent that the value of the lien, all other liens on the property, and the claimed exemption exceed the value of the debtor's interest in the property. The Defendants bore the burden of proof as to all elements necessary to avoid Plaintiff's lien, including valuation. In re Northern, 294 B.R. 821, 828 (Bankr. E.D. Tenn. 2003); Tedeschi v. Falvo (In re Falvo), 227 B.R. 662, 666 (6th Cir. BAP 1998).

Upon review of the record in this case, no evidence was presented at trial by the Defendants as to the value of the property, the other liens on the property, the exemptions claimed on the property, or any of the other elements necessary to support a motion of this type. Consequently, the Defendants did not carry their burden of proof and the Court must deny the Motion to Avoid Lien.

## CONCLUSION

The Court would first like to compliment counsel on the way this case was tried. Both counsel were prepared and did an excellent job of presenting their clients' cases. As stated above, the Court finds the entire debt dischargeable as to the Defendant, Dena French. With respect to the Defendant, Roger French, the Court finds that the Plaintiff proved by a preponderance of the evidence all the elements required to except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), and the $54,027.95 debt associated with the 2013 Direct Loan is excepted from discharge. Said debt includes post judgment interest as well as the Plaintiff's costs, expenses, and fees, including reasonable attorney's fees, incurred as the result of the enforcement of the agreement or collection of the indebtedness. The Court does not find, however, that Plaintiff carried its burden of proof with respect to the debt created by the Open Account. Absent showing a materially false written statement, any reasonable reliance, and any fraudulent intent with respect to the Open Account, the Court cannot except this debt from discharge under 11 U.S.C. § 523(a)(2)(B).

With respect to Count II of the complaint, without proof of an actual levy, the Court cannot find that the Plaintiff has a valid lien created by the sheriff's levy.  The Court can find, however, that with respect to Count III, the Plaintiff has a valid judgment lien by its recording of the judgment with the Union County Clerk.

Finally, without any evidence presented to support the motion, the Court must deny the Defendant's Motion to Avoid Lien. A separate Judgment and Order consistent with the foregoing will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

Alan C. Stout
United States Bankruptcy Judge

Dated: December 1, 2016

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| ROGER DARYL FRENCH and | ) | CASE NO. 15-40758 |
| DENA G. FRENCH | ) | |
| | ) | |
| DEBTORS | ) | |
| | ) | |
| SECURITY SEED AND CHEMICAL, INC. | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | ADVERSARY PROCEEDING |
| | ) | NO.15-4041 |
| | ) | |
| | ) | |
| ROGER DARYL FRENCH, and | ) | |
| DENA G. FRENCH | ) | |
| DEFENDANTS | ) | |

**JUDGMENT and ORDER**

Pursuant to the Court's Memorandum entered this same date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that judgment is rendered in favor of the Defendant, Dena G. French, and the debts the subject of this adversary proceeding are not excepted from discharge under 11 U.S.C. § 523(a)(2)(B).

**IT IS FURTHER ORDERED** that Plaintiff's judgment against Roger Daryl French in the amount of $54,027.95 related to the 2013 Direct Loan is nondischargeable under the provisions of 11 U.S.C. § 523(a)(2)(B). Said judgment also includes post judgment interest as well as the Plaintiff's costs, expenses, and fees, including reasonable attorney's fees, incurred as the result of the enforcement of the agreement or collection of the indebtedness.

**IT IS FURTHER ORDERED** that Plaintiff's judgment against Roger Daryl French in the

amount of $87,026.31 related to the Open Account is not excepted from discharge under the provisions of 11 U.S.C. § 523(a)(2)(B).

**IT IS FURTHER ORDERED** that the Plaintiff's request to determine the validity of its lien resulting from the execution by the sheriff is denied. Without proof of the actual levy, the Court cannot find the Plaintiff holds a valid and enforceable lien on the specific personal property.

**IT IS FURTHER ORDERED** that the Plaintiff holds a valid and enforceable judgment lien on the Defendants' real property located in Union County, Kentucky.

**IT IS FURTHER ORDERED** that the Defendant's Motion to Avoid Lien is denied.

This is a final and appealable order and there is no just reason for delay.

Alan C. Stout
United States Bankruptcy Judge

Dated: December 1, 2016